[No. S003956. Mar. 23, 1989.]

S. G. BORELLO & SONS, INC., Plaintiff and Appellant, v. DEPARTMENT OF INDUSTRIAL RELATIONS, Defendant and Respondent.

**COUNSEL**

Marcus Max Gunkel, Karen K. Carey and Sims & Gunkel for Plaintiff and Appellant.

Dressler & Quesenbery, Antone S. Bulich, Jr., Nancy N. McDonough and Carl G. Borden as Amici Curiae on behalf of Plaintiff and Appellant.

H. Thomas Cadell, Jr., and Frank C. S. Pederson for Defendant and Respondent.

T. Kirk McBride, Sue E. Manahl, Rucka, O'Boyle, Lombardo & McKenna, Joan M. Graff, Robert Barnes, William C. McNeill III, William G.

Hoerger, Joel Diringer and Michael Blank as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**EAGLESON, J.**—We ordered review to decide whether agricultural laborers engaged to harvest cucumbers under a written "sharefarmer" agreement are "independent contractors" exempt from workers' compensation coverage.[1] Our answer has implications for the employer-employee relationship upon which other state social legislation depends.[2]

The grower claims the "sharefarmer" harvesters are independent contractors under the statutory "control-of-work" test, because they manage their own labor, share the profit or loss from the crop, and agree in writing that they are not employees. After taking evidence on the nature of the work relationship, the Division of Labor Standards Enforcement (Division) of the Department of Industrial Relations rejected these contentions. The superior court found that the Division's decision was supported by the evidence. However, these rulings were reversed by the Court of Appeal.

Like the Division and the superior court, we find the grower's arguments unpersuasive. The grower controls the agricultural operations on its premises from planting to sale of the crops. It simply chooses to accomplish one integrated step in the production of one such crop by means of worker incentives rather than direct supervision. It thereby retains all necessary control over a job which can be done only one way.

Moreover, so far as the record discloses, the harvesters' work, though seasonal by nature, follows the usual line of an employee. In no practical sense are the "sharefarmers" entrepreneurs operating independent businesses for their own accounts; they and their families are obvious members of the broad class to which workers' compensation protection is intended to apply.

---

[1] There was no petition for review of the Court of Appeal's decision in this case. Because we considered the issue presented to be of substantial importance, we ordered review on our own motion. (Cal. Rules of Court, rule 28(a)(1).)

[2] The interest generated by the case is demonstrated by the number of amicus curiae briefs on file. Briefs have been received from the California Applicants' Attorneys Association, California Farm Bureau Federation, and Western Growers Association. The Employment Law Center and California Rural Legal Assistance have filed a joint brief on behalf of farmworker Cirilo Lopez.

We therefore conclude as a matter of law on the undisputed facts that the "sharefarmers" are "employees" entitled to compensation coverage. Accordingly, we reverse the judgment of the Court of Appeal.

FACTS

On August 14, 1985, a deputy labor commissioner issued a stop order/penalty assessment against S. G. Borello & Sons, Inc. (Borello), a Gilroy grower, for failure to secure workers' compensation coverage for the 50 migrant harvesters of its cucumber crop. (Lab. Code, §§ 3700, 3710.1, 3722.)[3] Borello appealed the citation to the Division. At the administrative hearing, Borello admitted the failure to secure coverage. It contended only that the workers were independent contractors excluded from the workers' compensation law. (§§ 3351, 3353.)

A preprinted agreement signed by the heads of harvester families was introduced in evidence. The agreement, printed in English and Spanish, designates the signatory worker as a "Share Farmer" and states that his function is to "prepare for and harvest the cucumbers." Borello agrees to "furnish and prepare the land; plant the crop; cultivate, spray, and fertilize the crop; and pay all the costs incurred with respect thereto." The grower also agrees to furnish the boxes and bins into which cucumbers will be loaded, and to transport the harvest to the buyer.

The "Share Farmer" agrees "to furnish himself and the members of his family, *but only the members of his own family,* to harvest the crop . . . ." (Italics in original.) "Harvest is agreed to mean the placing of the crop, clean and free from rubbish and debries [sic], in the boxes or bins supplied by [Borello]." The method and manner of accomplishing this task are left "solely" to the "Share Farmer," who nonetheless "agrees to utilize accepted agricultural practices in order to provide for the maximum harvest . . . and . . . to devote the necessary time to accomplish the harvest." The "Share Farmer" must supply his own tools and his own transportation to and from the field.

The agreement further provides that the crop harvested by the "Share Farmer" will be sold to a buyer "acceptable to both parties." Borello will retain title to the crop until it is sold, but the "Share Farmer" and Borello will split the gross proceeds equally. The contract specifies that the amount of the proceeds will depend exclusively upon price, weight, and grading data developed by the buyer. Copies of this data will be furnished to both

---

[3] All statutory references are to the Labor Code unless otherwise indicated.

parties. Borello undertakes to keep all necessary weight, grade, and price records, which shall be open to the "Share Farmer's" inspection.

Finally, the agreement recites that the parties deem themselves principal and independent contractor rather than employer and employee; that the "Share Farmer" is self-employed; that he will follow all child labor laws; that Borello will not withhold taxes; that the "Share Farmer" must file separate tax returns; and that Borello will not provide workers' compensation or disability insurance coverage. The contract is deemed personal and nonassignable except with the other party's consent.

Richard and Johnny Borello, principals of the company, testified as follows: Borello grows a number of crops, including cucumbers. All the other crops are harvested by employees on a wage basis. In recent years, the only local market for cucumbers is the Vlasic pickle company. Vlasic unilaterally determines the cucumber varieties it will accept and sets the prices it will pay. "The smaller the cucumber, the higher the price" per ton.

The growing cycle for cucumbers is 60 days. Borello plants and cultivates the crop at its own expense, using its own pipe irrigation system and applying pesticides under Vlasic's direction.

The harvest workers—14 migrant families during the 1985 season—arrive around "2-3 weeks" before the harvest begins. They "[want] to go on a sharefarming basis" because "they make a lot more money." Some families have returned to work under the system for several years running, and it is commonly employed for cucumber harvest in the Gilroy area. Vlasic supplies the preprinted "Share Farmer" contract form, which Borello has a family head sign. The contract is read and explained to the workers, in Spanish if necessary.

The sharefarmers may contract for the amount of land they wish to harvest on a first-come, first-served basis. One or two acres or twenty to forty rows is common. The workers are "totally responsible" for the care of the plants in their assigned plots during the harvest period. Besides hoeing and weeding, the harvesters must prevent the vines from growing into the furrows between the rows where they might be stepped on and damaged. The latter task is accomplished simply by laying any errant vine into the proper position. The sharefarmers also collectively decide when to irrigate during this period, but Borello controls the water supply.

Borello maintains no field supervisor and does not direct the harvesters' work. They may set their own hours. The workers decide when to pick each

cucumber at the correct size to maximize the profit. Profit incentive is the only guaranty of performance and quality control. Borello's only field employee is a tractor driver. He supplies empty boxes or bins, coded for each sharefarmer, and removes them to a loading area when full. The workers "could" transport their own harvest to Vlasic, but Borello handles the transportation because that is what Vlasic prefers.

Based on the code system, Vlasic keeps records of each sharefarmer's harvest. At Borello's request, the weekly check for the sharefarmer's share of proceeds is issued directly by Vlasic, though Richard Borello "physically" hands over the check and a copy of Vlasic's documentation. The sharefarmer then splits his share as he chooses with other family members working under him.

Borello's witnesses insisted that they have no right to discharge a sharefarmer or his workers during the harvest, and no recourse if the harvesters abandon the field. Despite contract terms which prohibit assignment of the sharefarmer agreement or employment of workers outside the sharefarmer's family, several sharefarmers have unilaterally assigned or sublet their plots when family emergencies arose. The workers leave once the cucumber harvest is over and do not harvest any other crops for Borello. Richard Borello conceded the grower provides no food or sanitary facilities for its cucumber harvesters.

On this evidence, the Division concluded that because of Borello's predominant control over the cultivation, harvest, and sale of its cucumbers, and the workers' lack of investment in the crop, they cannot be deemed "sharecroppers in the true sense." Hence, it ruled, they are employees rather than independent contractors. The penalty assessment/stop order was affirmed.[4]

Borello sought mandamus to review the Division's order. (Code Civ. Proc., § 1094.5.) After a hearing, the trial court found the Division's finding supported by the evidence and denied the writ.

The Court of Appeal reversed. It concluded that Borello's relinquishment of control over the harvesters' work, its lack of authority to discharge them

[4] At the time the deputy labor commissioner issued the penalty assessment/stop order for failure to secure compensation coverage, he also cited Borello for failure to obtain a work permit for a minor seen participating in the cucumber harvest. (§§ 1287, 1288, subd. (b), 1299.) Hearing on the child-labor citation was consolidated with the compensation matter. The defense and evidence presented as to each was identical, and the Division affirmed both citations. However, the child-labor citation was voluntarily vacated by the Division on November 26, 1985, and is not at issue here. (But see discussion, *post*, at p. 359.)

at will, their responsibility for furnishing necessary tools, the "result" method of compensation, the temporary nature of the work, and the mutual understanding embodied in the written contract all combine to render the sharefarmers independent contractors as a matter of law.

## DISCUSSION

The Workers' Compensation Act (Act) extends only to injuries suffered by an "employee," which arise out of and in the course of his "employment." (§§ 3600, 3700; see Cal. Const., art. XIV, § 4 (former art. XX, § 21).) "Employee[s]" include most persons "in the service of an employer under any . . . contract of hire" (§ 3351), but do not include independent contractors. The Act defines an independent contractor as "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." (§ 3353.)

■ The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the Division's decision must be upheld if substantially supported. (*Germann* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 776, 783 [176 Cal.Rptr. 868].) If the evidence is undisputed, the question becomes one of law (*Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 951 [88 Cal.Rptr. 175, 471 P.2d 975]), but deference to the agency's view is appropriate. The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced. (*Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 176 [151 Cal.Rptr. 671, 588 P.2d 811]; *Tieberg, supra,* 2 Cal.3d at p. 952; *Truesdale* v. *Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 614 [235 Cal.Rptr. 754]; *Martin* v. *Phillips Petroleum Co.* (1974) 42 Cal.App.3d 916, 922-923 [117 Cal.Rptr. 269]; see *Bemis* v. *People* (1952) 109 Cal.App.2d 253, 267 [240 P.2d 638].) The Act must be liberally construed to extend benefits to persons injured in their employment. (§ 3202.) One seeking to avoid liability has the burden of proving that persons whose services he has retained are independent contractors rather than employees. (§§ 3357, 5705, subd. (a).)

■ Borello and its amici (collectively the growers) urge that the Court of Appeal properly found independent contractorship as a matter of law. By agreement and in actual practice, the growers urge, Borello retains the cucumber sharefarmers for a "specified result"—a completed harvest—relinquishing all "control" over the "means" by which the task is accomplished. Moreover, the growers note, the sharefarmers are paid a "specified recompense" based entirely on results. The growers stress that the harvest-

ers furnish their own tools, exercise specialized skill, cannot be discharged, and have expressly accepted their independent status with its attendant risks and benefits. We disagree both with the growers' premises and with their conclusions.

The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him. The principal's supervisory power was crucial in that context because ". . . [t]he extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them. . . ." (1C Larson, The Law of Workmen's Compensation (1986) § 43.42, p. 8-20; see also 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1988) § 3.01[2], p. 3-4.) Thus, the "control of details" test became the principal measure of the servant's status for common law purposes.

Much 20th-century legislation for the protection of "employees" has adopted the "independent contractor" distinction as an express or implied limitation on coverage. The Act plainly states the exclusion of "independent contractors" and inserts the common law "control-of-work" test in the statutory definition. The cases extend these principles to other "employee" legislation as well. ▬ Following common law tradition, California decisions applying such statutes uniformly declare that "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . ." (*Tieberg, supra,* 2 Cal.3d at p. 946 [unemployment insurance]; see also, e.g., *Isenberg* v. *California Emp. Stab. Com.* (1947) 30 Cal.2d 34, 39 [180 P.2d 11] [same; drawing direct analogy to workers' compensation law]; *Perguica* v. *Ind. Acc. Com.* (1947) 29 Cal.2d 857, 859-861 [179 P.2d 812] [workers' compensation]; *Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43-44 [168 P.2d 686] [unemployment insurance].)

However, the courts have long recognized that the "control" test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.

Thus, we have noted that "[s]trong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations.]"

(*Tieberg, supra,* 2 Cal.3d at p. 949, quoting *Empire Star Mines, supra,* 28 Cal.2d at p. 43.) Additional factors have been derived principally from the Restatement Second of Agency. These include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (*Tieberg, supra,* at p. 949; *Empire Star Mines, supra,* 28 Cal.2d at pp. 43-44; see Rest.2d Agency, § 220.) ■ "Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." (*Germann, supra,* 123 Cal.App.3d at p. 783.)[5]

Moreover, the concept of "employment" embodied in the Act is not inherently limited by common law principles. We have acknowledged that the Act's definition of the employment relationship must be construed with particular reference to the "history and fundamental purposes" of the statute. (*Laeng* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 777-778 [100 Cal.Rptr. 377, 494 P.2d 1].)

---

[5] The Legislature itself has indicated recognition that "control of work details" is not necessarily the decisive test for independent contractorship. Section 2750.5, adopted in 1978, provides extensive guidelines for determining whether one who operates under a required contractor's license is an independent contractor or an employee. Under the statute, "[p]roof of [the licensee's] independent contractor status" *for any purpose* requires a showing *not only* that the parties have contracted for the "result" of the work rather than the "means by which it is accomplished" (the traditional "control" test) (subd. (a)), *but also* that "the [licensee] is customarily engaged in an independently established business" (subd. (b)) *and* that "[his] independent contractor status is bona fide and not a subterfuge to avoid employee status" (subd. (c)). Besides the "control" and "independent business" factors, the test of "bona fide" independent contractorship includes such "cumulative" indicia as "[the licensee's] substantial investment other than personal services in [his] business, holding out to be in business for [him]self, bargaining for a contract to complete a specific project for compensation by project rather than by time, control over the time and place the work is performed, supplying the tools or instrumentalities used in the work other than tools and instrumentalities normally and customarily provided by employees, hiring employees, performing work that is not ordinarily in the course of the principal's work, performing work that requires a particular skill, holding a license pursuant to the Business and Professions Code, the intent by the parties that the work relationship is of an independent contractor status, or that the relationship is not severable or terminable at will by the principal but gives rise to an action for breach of contract." (*Ibid.*) For work requiring a contractor's license, the worker "shall hold a valid . . . license as a condition of having independent contractor status." (*Ibid.*)

The common law and statutory purposes of the distinction between "employees" and "independent contractors" are substantially different. While the common law tests were developed to define an employer's liability for injuries caused *by* his employee, "the basic inquiry in compensation law involves which injuries *to* the employee should be insured against by the employer. [Citations.] . . . ." *(id.,* at pp. 777-778, fn. 7 [italics in original]; 1 Larson, *supra,* § 43.42, pp. 8-20, 8-21; 2 Hanna, *supra,* § 3.01[2], p. 3-4, & fn. 14.)

Federal courts have long recognized that the distinction between tort policy and social-legislation policy justifies departures from common law principles when claims arise that one is excluded as an independent contractor from a statute protecting "employees." Where not expressly prohibited by the legislation at issue, the federal cases deem the traditional "control" test pertinent to a more general assessment whether the overall nature of the service arrangement is one which the protective statute was intended to cover. (E.g., *Bartels* v. *Birmingham* (1947) 332 U.S. 126, 130-132 [91 L.Ed. 1947, 1953-1954, 67 S.Ct. 1547, 172 A.L.R. 317]; *Rutherford Food Corp.* v. *McComb* (1947) 331 U.S. 722, 727-730 [91 L.Ed. 1772, 1776-1778, 67 S.Ct.1473]; *United States* v. *Silk* (1947) 331 U.S. 704, 713-718 [91 L.Ed. 1757, 1767-1770, 67 S.Ct. 1463]; *Board* v. *Hearst Publications* (1944) 322 U.S. 111, 124-132 [88 L.Ed. 1170, 1181-1185, 64 S.Ct. 851]; but see *United States* v. *Webb, Inc.* (1970) 397 U.S. 179, 183-190 [25 L.Ed.2d 207, 211-215, 90 S.Ct. 850] [1948 amendments to Federal Insurance Contributions Act and Federal Unemployment Tax Act providing that employment relationship must be determined by "usual common-law rules"[6]].)

A number of state courts have agreed that in worker's compensation cases, the employee-independent contractor issue cannot be decided absent

---

[6] We find no similar express confinement to common law principles in our workers' compensation scheme. Though early cases suggested that the California Constitution (art. XIV, § 4, former art. XX, § 21) precluded any expansion or contraction under the Act of the common law definitions of "employee," "employer," "employment," "independent contractor," and "control" (see, e.g., *Fidelity & C. Co.* v. *Industrial Acc. Com.* (1923) 191 Cal. 404, 406 [216 P. 578, 43 A.L.R. 1304]; *Flickenger* v. *Industrial Acc. Com.* (1919) 181 Cal. 425, 432 [184 P. 851, 19 A.L.R. 1150]), more recent developments belie that notion. In contrast with the federal situation, there has been no statutory or constitutional response to the holding of *Laeng, supra,* 6 Cal.3d 771, that common law principles are *not* dispositive of the employment relationship contemplated by the Act. Moreover, the Legislature has extended compensation coverage to "employees" who might not have been considered as such under the common law. (See, e.g., §§ 3360 [workmen in partnership formed to perform "labor on a particular piece of work" are employees of person for whom such work is performed], 2750.5 [establishing detailed standards for determining whether person licensed under Business and Professions Code is employee or independent contractor; providing that unlicensed person can never be independent contractor]; see also *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5 [219 Cal.Rptr. 13, 706 P.2d 1146] [construing § 2750.5; no unconstitutionality suggested].)

consideration of the remedial statutory purpose. Several state cases have so concluded despite statutes, like California's, which emphasize "control" of the work as the governing distinction between employees and independent contractors. (See, e.g., *Anton* v. *Industrial Commission of Arizona* (Ariz.App. 1984) 141 Ariz. 566 [688 P.2d 192, 197-200] [statute defines excluded "independent contractor" as one "not subject to the rule or control of the person for whom the work is done, but . . . engaged only in the performance of a definite job or piece of work [and] subordinate to the employer only in effecting a result in accordance with the employer's design"]; *Woody* v. *Waibel* (1976) 276 Ore. 189 [554 P.2d 492, 495-497] [statute covers "workmen," defined as persons who furnish services for remuneration "subject to the direction and control of an employer"]; see also *Matter of Kokesch* (Minn.App. 1987) 411 N.W.2d 559, 562; *Grothe* v. *Olafson* (Alaska 1983) 659 P.2d 602, 605 ["control of details" definition repealed in 1959]; *Ceradsky* v. *Mid-America Dairymen, Inc.* (Mo.App. 1979) 583 S.W.2d 193, 196-197; *Burton* v. *Crawford and Company* (1976) 89 N.M. 436 [553 P.2d 716, 719-720]; *Evans* v. *Naihaus* (La.App. 1976) 326 So.2d 601, 603; *Sandy* v. *Salter* (1976) 260 Ark. 486 [541 S.W.2d 929, 931-932]; *Caicco* v. *Toto Brothers, Inc.* (1973) 62 N.J. 305 [301 A.2d 143, 145-146]; *Tata* v. *Benjamin Muskovitz Plumbing & Heating* (1959) 354 Mich. 695 [94 N.W.2d 71, 74]; *Seals* v. *Zollo* (1959) 205 Tenn. 465 [327 S.W.2d 41, 44-45]; *Paly* v. *Lane Brush Co.* (1958) 6 A.D.2d 50 [174 N.Y.S.2d 205, 209-210]; but see *Kirkwood* v. *Industrial Commission* (1981) 4 Ill.2d 14 [416 N.E.2d 1078, 1082] [approving remedial construction in principle, but citing business reliance on traditional "control" rule].)

Our decision in *Laeng, supra,* 6 Cal.3d 771, did not directly involve the statutory distinction between employees and "independent contractors." However, since *Laeng,* several of our own Courts of Appeal have suggested that traditional California tests for independent contractor status must be supplemented in compensation cases by consideration of the remedial purpose of the statute, the class of persons intended to be protected, and the relative bargaining positions of the parties. (E.g., *Truesdale* v. *Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 617 [235 Cal.Rptr. 754]; *Germann, supra,* 123 Cal.App.3d at p. 784; *Johnson* v. *Workmen's Comp. Appeals Bd.* (1974) 41 Cal.App.3d 318, 322-323 [115 Cal.Rptr. 871].)

We agree that under the Act, the "control-of-work-details" test for determining whether a person rendering service to another is an "employee" or an excluded "independent contractor" must be applied with deference to the purposes of the protective legislation. The nature of the work, and the overall arrangement between the parties, must be examined to determine

whether they come within the "history and fundamental purposes" of the statute. (*Laeng, supra,* 6 Cal.3d at p. 777.)

■ The purposes of the Act are several. It seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries. (See *Laeng, supra,* 6 Cal.3d at p. 782; *Van Horn* v. *Industrial Acc. Com.* (1963) 219 Cal.App.2d 457, 467 [33 Cal.Rptr. 169]; 2 Hanna, *supra,* § 1.05[1], [2], pp. 1-25 to 1-27.).

The Act intends comprehensive coverage of injuries in employment. It accomplishes this goal by defining "employment" broadly in terms of "service to an employer" and by including a general presumption that any person "in service to another" is a covered "employee." (§§ 3351, 5705, subd. (a); see *Laeng, supra,* 6 Cal.3d at pp. 776-778.)

■ The express exclusion of "independent contractors" is purposeful, of course, and has a limited but important function. It recognizes those situations where the Act's goals are best served by imposing the risk of "no-fault" work injuries directly on the provider, rather than the recipient, of a compensated service. This is obviously the case, for example, when the provider of service has the primary power over work safety, is best situated to distribute the risk and cost of injury as an expense of his own business, and has independently chosen the burdens and benefits of self-employment.

This is the balance to be struck when deciding whether a worker is an employee or an independent contractor for purposes of the Act. We adopt no detailed new standards for examination of the issue. To that end, the Restatement guidelines heretofore approved in our state remain a useful reference. The standards set forth for contractor's licensees in section 2750.5 (see fns. 5, 6, *ante,* at pp. 351-352) are also a helpful means of identifying the employee/contractor distinction. The relevant considerations may often overlap those pertinent under the common law. (See *Laeng, supra,* 6 Cal.3d at pp. 777-778, fn. 7.) ■ Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case.

We also note the six-factor test developed by other jurisdictions which determine independent contractorship in light of the remedial purposes of the legislation. Besides the "right to control the work," the factors include

(1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special.skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business. (*Real* v. *Driscoll Strawberry Associates, Inc.* (9th Cir. 1979) 603 F.2d 748, 754 [Fair Labor Standards Act].)

■ As can be seen, there are many points of individual similarity between these guidelines and our own traditional Restatement tests. (See discussion, *ante,* at pp. 350-351.) We find that all are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law.

■ By any applicable test, we must dismiss the growers' claims here. Despite Borello's elaborate effort to deal with the cucumber harvesters as independent contractors, the indicia of their employment are compelling.

The issue has arisen on several occasions elsewhere. There, as here, growers claimed that migrant harvesters of their cucumber crops were self-employed "sharefarmers," who contracted for a finished job, applied skill and judgment, controlled their own work, and were compensated only for results. Hence, the growers urged, the harvesters were not "employees" for purposes of protective legislation, but excluded "independent contractors."

With one exception, the cases have rejected such contentions. The decisions emphasize that the growers, though purporting to relinquish supervision of the harvest work itself, retained absolute overall control of the production and sale of the crop. Moreover, the cases note, the workers made no capital investment beyond simple hand tools; they performed manual labor requiring no special skill; their remuneration did not depend on their initiative, judgment, or managerial abilities; their service, though seasonal, was rendered regularly and as an integrated part of the grower's business; and they were dependent for subsistence on whatever farm work they could obtain. Under these circumstances, the authorities reason, the harvesters were within the intended reach of the protective legislation. (*Sec'y of Labor, U.S. Dept. of Labor* v. *Lauritzen* (7th Cir. 1987) 835 F.2d 1529, 1536-1538, cert. denied (1988) __ U.S. __ [102 L.Ed.2d 232, 109 S.Ct. 243]; *Beliz* v. *W.H. McLeod & Sons Packing Co.* (5th Cir. 1985) 765 F.2d 1317, 1329-1330; *Donovan* v. *Gillmor* (N.D.Ohio 1982) 535 F.Supp. 154, 159-163; *Kokesch, supra,* 411 N.W.2d at pp. 562-563; contra,

*Donovan* v. *Brandel* (6th Cir. 1984) 736 F.2d 1114, 1116-1120.) Similar considerations are dispositive here.

The growers emphasize that, with respect to the cucumber harvest, Borello contracts only to obtain a "specified result" for a "specified recompense," retaining no interest in the details of the work. They stress that the sharefarmers work free of Borello's interference, have all legal and actual power over the means of accomplishing their work, and are paid for their production rather than their labor. The job involves considerable skill and judgment, the growers urge, because the crops require final hoeing, weeding, and irrigation; the vines must be "trained" out of the furrows; and care is necessary to pick each maturing cucumber at the most marketable size. Hence, the growers assert, the factor of "control" weighs against a finding of employment.

We are not persuaded. In the first place, Borello, whose business is the production and sale of agricultural crops, exercises "pervasive control over the operation as a whole." (*Lauritzen, supra,* 835 F.2d at p. 1536.) Borello owns and cultivates the land for its own account. Without any participation by the sharefarmers, Borello decides to grow cucumbers, obtains a sale price formula from the only available buyer,[7] plants the crop, and cultivates it throughout most of its growing cycle. The harvest takes place on Borello's premises, at a time determined by the crop's maturity. During the harvest itself, Borello supplies the sorting bins and boxes, removes the harvest from the field, transports it to market, sells it, maintains documentation on the workers' proceeds, and hands out their checks. Thus, "[a]ll meaningful aspects of this business relationship: price, crop cultivation, fertilization and insect prevention, payment, [and] right to deal with buyers . . . are controlled by [Borello]." ▮ ▮▮ ▮▮ ▮ (*Gillmor, supra,* 535 F.Supp. at p. 161.)[8]

▮▮ Moreover, contrary to the growers' assertions, the cucumber harvest involves simple manual labor which can be performed in only one correct way. Harvest and plant-care methods can be learned quickly. While the work requires stamina and patience, it involves no peculiar skill beyond that expected of any employee. (*Lauritzen, supra,* at p. 1537; *Gillmor, supra,* at p. 162; *Kokesch, supra,* 411 N.W.2d at p. 563.) It is the simplicity of the work, not the harvesters' superior expertise, which makes detailed supervi-

---

[7] Thus, little credence can be placed in the sharefarmer contract's recitation that "[t]he crop shall be sold to a buyer acceptable to both parties."

[8] Thus, the cucumber sharefarmers are not true "sharecroppers," who themselves occupy the land, invest in equipment and seeds, plant the crop, take responsibility for its cultivation and harvest, and split the sale proceeds as a form of rent.

sion and discipline unnecessary. Diligence and quality control are achieved by the payment system, essentially a variation of the piecework formula familiar to agricultural employment.

Under these circumstances, Borello retains all *necessary* control over the harvest portion of its operations. ■ A business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks "control" over the exact means by which one such step is performed by the responsible workers. (*Silk, supra,* 331 U.S. at pp. 706, 718 [91 L.Ed. at pp. 1764, 1770]; see *Powell* v. *Appeal Board of Michigan Empl. Sec. Com'n* (1956) 345 Mich. 455 [75 N.W.2d 874, 883] [dis. opn. of Smith, J.].)[9]

■ Other factors also show convincingly that the workers' compensation statute places the risk and cost of work-related injuries upon Borello, rather than the farm workers themselves. The harvesters form a regular and integrated portion of Borello's business operation. Their work, though seasonal by nature, is "permanent" in the agricultural process. Indeed, Richard Borello testified that he has a permanent relationship with the individual harvesters, in that many of the migrant families return year after year. This permanent integration of the workers into the heart of Borello's business is a strong indicator that Borello functions as an employer under the Act. (See, e.g., *Lauritzen, supra,* 835 F.2d at pp. 1535-1538; *Kokesch, supra,* 411 N.W.2d at pp. 562-563; 1C Larson, *supra,* § 45.00, p. 8-174 ["The modern tendency is to find employment when the work being done is an integral part of the regular business of the employer, and when the worker, relative to the employer, does not furnish an independent business or professional service."].)

By the same token, the sharefarmers and their families exhibit no characteristics which might place them outside the Act's intended coverage of employees. They engage in no distinct trade or calling. They do not hold themselves out in business. They perform typical farm labor for hire wherever jobs are available. They invest nothing but personal service and hand tools.[10] They incur no opportunity for "profit" or "loss"; like employees

---

[9] In fact, Borello does retain important rights which would normally inure to a self-employed contractor. Under the written agreement, sharefarmers may hire only members of their own families to help work their rows. Richard Borello testified he did not know why Vlasic had included this restriction in the printed form, and he claimed it is not enforced. However, it is the right to control, not the exercise of the right, which bears on the status of the work arrangement. (E.g., *Perguica, supra,* 29 Cal.2d at pp. 859-860.)

[10] Indeed, by deeming the sharefarmers independent contractors, Borello has avoided its obligation under California law to provide its agricultural employees all necessary tools and

hired on a piecework basis, they are simply paid by the size and grade of cucumbers they pick.[11] They rely solely on work in the fields for their subsistence and livelihood. Despite the contract's admonitions, they have no practical opportunity to insure themselves or their families against loss of income caused by nontortious work injuries.[12] If Borello is not their employer, they themselves, and society at large, thus assume the entire financial burden when such injuries occur.[13] Without doubt, they are a class of workers to whom the protection of the Act is intended to extend.[14]

The growers suggest that by signing the printed agreement after full explanations, the sharefarmers expressly agree they are not employees and consciously accept the attendant risks and benefits. However, the protections conferred by the Act have a public purpose beyond the private interests of the workers themselves. Among other things, the statute represents society's recognition that if the financial risk of job injuries is not placed upon the businesses which produce them, it may fall upon the public treasury. (See discussion, *ante*.) ■ Of course, a worker's express or implied agreement to forego coverage as an independent contractor is "significant." (See *Tieberg, supra,* 2 Cal.3d at p. 952.) However, where compelling indicia of employment are otherwise present, we may not lightly assume an individual waiver of the protections derived from that status.

---

equipment unless the employee's wages equal two times the minimum wage. (Cal. Code Regs., tit. 8, § 11140, subd. 9(B).)

[11] That the amount per cucumber earned by the sharefarmers is set by the crop's sale price, rather than directly by Borello, does not mean the sharefarmers are earning a "profit" as a reward for their entrepreneurial risk. Before the harvesters arrive, the buyer of the crop, and the sale price based on grade and size, have already been set. By the same token, the sharefarmers incur no entrepreneurial risk of "loss." The growers stress that the sharefarmers assume the "risk" the crop will be unharvestable. So, of course, would any employee engaged for the harvest. This "risk" is not "entrepreneurial" as the growers suggest, but is the chance faced by any at-will wage earner that his services will not be needed after all. The record does not clearly indicate that the sharefarmers would go unpaid—and so understood—in the unlikely event the cucumber crop became unsaleable *after* the harvest.

[12] If deemed an independent contractor, the sharefarmer himself is presumably not eligible for self-procured personal workers' compensation coverage. (See §§ 3501, 3503, 3600, 3700.) He must therefore rely on personal accident, disability, or income-protection insurance he is unlikely to procure. Nor is it reasonable to assume the sharefarmer/contractor, often a migrant who works with his family in many states each year, can or will obtain compensation insurance for the other family members who become *his* "employees" under the contract with Borello.

[13] The growers have suggested that Borello is not the "employer" of the cucumber harvesters in any event, since it is *Vlasic,* not Borello, that dictates the "sharefarmer" arrangement. The contention is specious. Whatever Borello's reasons for using the Vlasic contract form, the relationship between Borello and the harvesters is not thereby obviated. Under the contract and in reality, the harvesters are recruited by Borello to work on Borello's land harvesting crops owned by Borello until sold after harvest to Vlasic.

[14] The Legislature has made clear its intent to cover agricultural workers under the Act. Their exclusion from coverage was repealed in 1959. (Stats. 1959, ch. 505, § 1, p. 2466; see Lab. Code, § 3352, former subd. (c).)

■ Moreover, there is no indication that Borello offers its cucumber harvesters any real choice of terms. Richard Borello testified only that the family heads sign the preprinted contract. He conceded that recent seasons have brought a surplus of workers to the local cucumber harvest, suggesting further that no real bargaining takes place. Nor is there evidence that nonsignatory members of the sharefarmer's family have accepted Borello's disclaimer of employment responsibilities. The record fails to demonstrate that the harvesters voluntarily undertake an "independent" and unprotected status.[15]

A conclusion that the sharefarmers are "independent contractors" under the Act would suggest a disturbing means of avoiding an employer's obligations under other California legislation intended for the protection of "employees," including laws enacted specifically for the protection of agricultural labor. These include the Agricultural Labor Relations Act (§ 1141 et seq.), statutes requiring the licensure and bonding of farm labor contractors (§ 1682 et seq.), laws governing minimum wages, maximum hours, and (as illustrated in this case) employment of minors (§ 1171 et seq., § 1285 et seq.), the antidiscrimination provisions of the Fair Employment and Housing Act (Gov. Code, § 12940 et seq.), and provisions governing employee health and safety (see, e.g., Lab. Code, § 6300 et seq. [Occupational Health and Safety Act]; Health & Saf. Code, § 5474.20 et seq. [imposing duty, not followed here, to provide toilet and washing facilities for each 40 or fewer field "employees"].)[16]

---

[15] Richard Borello testified that the harvesters seek and "prefer" the sharefarmer arrangement because they make more money. However, aside from the absence of evidence that a choice was available, the facts belie any claim of true economic advantage in the sharefarmer arrangement. In the first place, any increase in immediate cash income is offset by the loss of statutory financial protections due employees. In the second place, even the cash advantage appears illusory. Richard Borello testified that the typical hourly wage rate for harvest work in the Gilroy area during the 1985 season was $4 per hour, but that a sharefarmer makes "at least $7-$8 an hour if you were to break it down." Vlasic's individual harvest summaries for the week ending July 4, 1985, indicate that sharefarmer earnings that week ranged from a high of $634.34 to a low of $136.04. Richard Borello acknowledged that these amounts must be *split* among all the members of the sharefarmer's family who are working in his plot, sometimes as many as eight or nine people —"[h]owever large the family is." This may produce an effective hourly rate far below that which each worker would presumably have received as an employee.

[16] The California Unemployment Insurance Law specifically requires that, in most cases, the status of a covered "employee" must be determined by "usual common law rules." (Unemp. Ins. Code, § 621, subd. (b).) Moreover, absent election by the employer, one may not be deemed an "employee" for unemployment insurance purposes if he has "a substantial investment in [nontransportation] facilities" used to perform the service, "or if the services are in the nature of a single transaction not part of a continuing relationship with the employing unit for whom the services are performed." (*Id.,* subd. (c)(2).) We need not decide whether these provisions would require a different determination of the sharefarmers' relationship to Borello for purposes of unemployment insurance coverage. At least one precedent tax deci-

We therefore hold as a matter of law that Borello has failed to demonstrate the cucumber sharefarmers are independent contractors excluded from coverage under the Act. Accordingly, the judgment of the Court of Appeal, directing the superior court to grant Borello's petition for writ of mandate, is reversed.

Lucas, C. J., Mosk, J., Broussard, J., and Arguelles, J.,* concurred.

**KAUFMAN, J.**—I dissent.

This court's sua sponte grant of review[1] and the resulting majority opinion, substantially departing from long and well established statutory and case law, constitute one of the sadder episodes in the history of this court— a wholly unnecessary and inappropriate intermeddling in the affairs of and curtailment of the liberties of California's residents. It requires little foresight to predict that this unfortunate decision declaring illegal a practice followed almost universally in the area for many years, insisted on by the only cucumber purchaser in the area and satisfactory to all concerned, will end up harming the very persons it is paternalistically intended to help. Will Rogers is reported to have articulated the folk wisdom: "If it ain't broke, don't fix it." That is sound advice for any branch of government; it should be adhered to religiously by the judiciary.

At the time we granted review in this case, there was considerable curiosity why no petition for review had been filed by any party. At oral argument the parties told us why; they rather frankly indicated their mutual recognition that the record in this case was entirely insufficient to furnish the basis for a decision of major significance. The entire hearing transcript including exhibits consists of only 60 pages; the department presented no witnesses; not a single sharefarmer testified; the only witnesses were 2 members of the Borello family active in the business. Having ascertained this it would have been quite appropriate for this court to vacate the order granting review as improvidently granted (see Cal. Rules of Court, rule 29.4(c)), but apparently too embarrassed to dismiss following its sua sponte grant of review, the majority now proceed to render a decision distorting independent contractor law and, in the process, rely on a number of facts and assumptions wholly unsupported by the record.

There are really two cases being decided today, the one decided by the majority and the one presented by the record before the court. The picture

---

sion of the Unemployment Insurance Appeals Board has found cucumber harvesters to be independent contractors under similar facts. (Dino J. Orsetti (Apr. 11, 1985) No. T-85-53.)

* Retired Associate Justice of the Supreme Court setting under assignment by the Chairperson of the Judicial Council.

[1] No party nor any other person assertedly aggrieved by the Court of Appeal decision sought review. Review was granted on this court's own motion.

painted by the majority is one of a nefarious subterfuge invented by S.G. Borello & Sons, Inc. (Borello) to evade its responsibilities under the workers' compensation laws and to exploit vulnerable and disadvantaged immigrant farm workers.[2] The uncontroverted evidence in the record establishes an altogether different picture. Neither the Division of Labor Standards (the Division) nor the superior court found a subterfuge,[3] and there is no evidence whatever that Borello originated this arrangement, much less that it concocted it to evade its obligations under the workers' compensation laws. Indeed, unless the sharefarmers are employees under the Workers' Compensation Act (Act), Borello has no obligations thereunder. The reasoning of the majority in this regard is a classic example of begging the question. The same is true of the majority's appeal to "liberal construction" as provided for in Labor Code section 3202.[4] Liberal construction is for the benefit only of persons covered by the Act, employees. Moreover, as section 3202.5 reminds, liberal construction is no substitute for substantial evidence.[5]

The record establishes that Borello has a sizable farming operation employing numerous farm laborers who work with numerous other types of crops. Borello covers all such employees by workers' compensation insurance and they are paid on an hourly or other basis regardless of the success or failure of the crop or the marketing of the crop, consistent with their status as employees. Only the pickle cucumber crop is produced and marketed by the use of the sharefarmer arrangement which involves 14 families. This arrangement and its details are dictated by the sole pickle cucumber purchaser in the area, Vlasic Pickle Company. Vlasic drafted and supplies

[2] The majority makes the gratuitous assumptions that the sharefarmers do not obtain insurance coverage for themselves and would not be able to afford it in any event. The truth is that there is not one iota of evidence in the record supporting these assumptions. For all the record shows, the sharefarmers may be fully covered by health and/or accident insurance. Indeed, it is noteworthy that this is not a workers' compensation proceeding instituted by an injured sharefarmer, nor is there any evidence that any sharefarmer has ever been injured or disabled. It was specifically observed at the hearing that there was no known workers' compensation case arising out of this relationship.

[3] As the majority states, " . . . the Division concluded that because of Borello's predominant control over the cultivation, harvest, and sale of its cucumbers, and the workers' lack of investment in the crop, they [the sharefarmers] cannot be deemed 'sharecroppers in the true sense.' Hence, it ruled, they are employees rather than independent contractors. . . . [T]he trial court found the Division's finding supported by the evidence and denied the writ." (Maj. opn., *ante,* p. 348, fn. omitted.)

[4] All statutory references are to the Labor Code unless otherwise indicated.

[5] Section 3202.5 reads: "Nothing contained in Section 3202 shall be construed as relieving a party from meeting the evidentiary burden of proof by a preponderance of the evidence. 'Preponderance of the evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth. When weighing the evidence, the test is not the relative number of witnesses, but the relative convincing force of the evidence."

the sharefarmer contract form and insists on its use by every farmer who furnishes cucumbers to it. Vlasic unilaterally sets the price it will pay for cucumbers each year before the sharefarmer agreements are signed.

The sharefarmer arrangement has been in virtually universal use in the Gilroy area for at least the 10 years Borello has been growing pickle cucumbers. According to the uncontradicted testimony of both witnesses at the hearing, this arrangement is preferred by the sharefarmer families because it affords them an opportunity to make much more money than they would as hourly workers. (See discussion, *infra*.) During the ten years Borello has been growing pickle cucumbers, many of the sharefarmer families have returned several years, and at least one family has returned each year for nine years. Experienced sharefarmer families often bring with them and recommend to Borello new families who want to work on and harvest the cucumbers under the sharefarmer arrangement.

The majority states (maj. opn., *ante*, p. 345) that caring for and harvesting cucumbers are nothing more than manual labor and that Borello "retains all necessary control over a job which can be done only one way." All the evidence in the record is to the contrary. Richard Borello testified without contradiction that experienced sharefarmers will make more than inexperienced ones and that considerable skill was required in caring for and harvesting the cucumbers during the time the sharefarmers are responsible for the crop. Specifically he testified: "He [the sharefarmer] comes in, he pulls the weeds, and he does, he does put the, at that time the vines are just starting to fall into the furrow, and he does take those vines and he slips them under the plant so that way they grow along the row line. That way they're not in furrow, so people don't step on them and you could do a lot of damage by letting the vines grow into the furrows and then as they walk through they step on them. That is you could lose 20% of your cucumbers that way. And it's their responsibility to take care of that plant and put the vines under the plants and pull the weeds." He further testified that from the time they execute their contracts, the sharefarmers "are totally responsible for the harvest and the care of the plants. If that involves weeding or hoeing, then they're responsible for that. They take care of that." "[T]here is irrigation and the sharefarmer takes care of his rows and the irregation [*sic*]. The only thing I do is I provide the water. Which means I press the button and start the pump." Asked who would decide when to irrigate, Richard Borello testified: "The sharecroppers work together. They understand that the field cannot be watered so many rows at a time, so they work together as sharefarmers. They all come to an agreement when they're going to pick [*sic*: irrigate?]. I don't have nothnig [*sic*] to do with it." Asked what he would do if he thought a sharefarmer was damaging the crop

through improper irrigation, he responded: "I lose, then I lose. There's nothing I can do about it. But it doesn't work that way though because they lose also. They would lose also. Why would they want to damage their crop?"

As an indication of the individual skill needed to train the vines and care for the cucumber crop, Richard Borello testified that "If they [the share-farmers] abandon the field then I lose. . . . [T]hen it's hard to or for another sharecropper to come in a [sic] take those rows 'cause they may not like the way the person handled the plants, and if he didn't have the plants right, then the crop is lost." It is also difficult to take over the crop because "It's very important to keep the vine clean of large cucumbers because it stresses the plant. . . ."

As to the time at which the sharefarmers were to do their work Richard Borello testified: "They're experienced cucumber pickers. And they realize that starting too early in the morning is not good for the plants. And they want to keep them [sic] plants as healthy and produce as much as possible. It's in their best interest. So they start later on in the day and, many times, some sharecroppers won't show up. Some will start, say at 8:00 and others will come in at 10:00 depending on [sic] some people don't care quite as much about the plants. Some people say, 'well I want to get it over with.' And they go in in the morning and they pick it even when the plant is wet which hurts the plant. But I have no say over that. Others come in at 10:00 when the plant is dry which is better for the plant, and others will come in at 6:00 at night and pick only in the evening. So I have no say over the times or the hours." As to which persons were to do the work he testified: "No, I have no control at all. It, the sharefarmer furnishes, the sharefarmer, it says in the contract here, that they only use family members. It's even under-lined in the contract. And being a sharefarmer or a contractor I have no control over who they put in the field other than they should agree with this document that they have only their family members."[6]

Asked whether there was "any type of quality control involved by either Vlasic or Borello," Richard Borello testified: "There is no quality control other than, ya [sic] know, self motivation of making the most, by picking the smallest cucumber and taking care of the plants, that is the motivation. That is the quality control. . . . That's right. If they pick big cucumbers, they make less, and I make less. If they pick small cucumbers, then they make good, and I make good."

---

[6]The majority find significant that the contract allows for work only by family members, but the reason for that requirement is quite apparent. Otherwise, the head of the family might be illegally acting as a labor contractor. (See § 1140.4, § 1682 et seq.)

Again, the majority's assertion that "in no practical sense are the 'share-farmers' entrepreneurs" is an unsupported conclusion. Two essential facts established by the uncontradicted evidence demonstrate that these share-farmers are entrepreneurs: One, they cannot be terminated or discharged without cause during the term of the contract or even, according to the testimony, for inadequate performance; second, if the crop fails, is destroyed or for any reason cannot be marketed, the sharefarmers will not be compensated for their labors, no matter how many hours they have worked.

These facts also demonstrate the majority's error in stating that the sharefarmers make no investment in the enterprise. They invest the value of their labor. That may be insignificant to the majority but it is no doubt significant to the sharefarmers, as it is to me. The value of one's labor is ultimately the source of all capital. Many generations of American immigrants have become successful entrepreneurs doing just that—investing the only asset at their command, the value of their labor.

Borello too incurs real and substantial risks and obtains real benefits from the sharefarmer arrangement. Borello saves the cost of hiring supervisors to control the manner and quality of the work. On the other hand, it gives up its right to control the manner in which and the time at which the work is performed. As Richard Borello explained, Borello retains no control over the work and if the sharefarmers lose because of improper care or harvesting of the crop, Borello also loses.

The majority's conclusion that the "record fails to demonstrate that the harvesters voluntarily undertake an 'independent' and unprotected status" (maj. opn., *ante,* p. 359) is not based on any finding of the Division or the superior court (see fn. 3, *ante*) and again is simply contrary to the uncontradicted evidence of record. The written agreement expressly provides that the sharefarmer is an independent contractor and discloses that Borello will not withhold taxes or carry workers' compensation insurance covering the sharefarmers or their families. It is written in plain language, both in Spanish and English, and was explained to the sharefarmers in Spanish where appropriate before it was signed. Contrary to the implication in the majority opinion, there is no law establishing that a person's decision to enter into a transaction is involuntary unless he or she has been offered alternative arrangements. And the uncontradicted testimony of both Richard and Johnny Borello, the only witnesses, was that the sharefarmers like the sharefarmer arrangement because, for one reason, they can make much more under this arrangement than as hourly laborers.[7] (See further discus-

---

[7] Though there was no testimony on the point, it is also apparent from the evidence that, except perhaps for the time when picking is at its peak, the full time of all family members

sion, *infra*.) The Borellos' testimony was verified by the fact that families often return year after year and even recommend the arrangement to other families who they bring with them to join in.

The statement by the majority that there is no evidence "that nonsignatory members of the sharefarmer's family have accepted Borello's disclaimer of employment responsibilities" (maj. opn., *ante,* p. 359) is amazing. The head of the family obviously enters into the sharefarmer agreement for himself and the rest of the family as their authorized agent. There is simply no evidence to the contrary nor is there any other reasonable inference. Significantly, not a single sharefarmer nor any other witness was called by the department to contradict the testimony of the Borellos.

Even more astonishing is the majority's attempt to discredit the uncontradicted evidence that the harvesters are able to earn considerably more as sharefarmers than they could as hourly employees. (Maj. opn., *ante,* p. 359, fn. 15.) Richard Borello was asked: "Why is that they like to typically go on a sharefarmer basis, then [*sic*] let's say, paying them an hourly wage?" He responded: "Well they make a lot more money on the sharefarmer basis." Later he was asked: "Now, if they were working on an hourly basis, what would be their typical hourly rate?" He responded: "Probably they'd be $4.00 an hour, that's the going rate in Gilroy right now." He was next asked: "Is it fair to say then, that the amount of money they make under this arrangement is typically substantially greater than . . . ." He answered: "Oh yes, it's at least $7-8 an hour if you were to break it down."

Johnny Borello's testimony was to the same effect. His testimony germane to the question is as follows: "Q: Now, are you aware of any farmers in the Gilroy area that are not using the sharefarmer arrangement?

"A: There's a few.

"Q: Do you have any reason, do you know why, that, why they may not be using that particular sharefarmer arrangement?

"A: Well, [if] they use this system, the workers make more. . . .

"Q: Based on your experience in having been on the farm there for a while, does it appear that the sharefarmers that come in are happy with that arrangement and that they want to share the sharecropping arrangement?

---

would not be required by the sharefarming arrangement, and, conceivably, some members of the family could be simultaneously employed elsewhere on a part-time basis.

"A: They want to do it. They're happier, that way.

"Q: In your opinion would they make more money that way?

"A: Way more."

It is true that Richard Borello testified that whatever proceeds of sale were paid each week would be divided among the family members, but no inference can be drawn from that obvious fact that the amount earned would be less than that earned by an hourly employee. The amount of the proceeds of sale would naturally depend on the number and kind of cucumbers harvested and sold during a particular week, and the weekly amounts referred to by the majority do not indicate either the number of hours worked nor the number of persons who picked the cucumbers sold that week. It is thus impossible to draw from the weekly amounts any rational inference as to what average hourly wage would have been equivalent. What is left is the uncontradicted and uncontroverted testimony of Richard and Johnny Borello.

And so I come at last to the law. The controlling law is clear and simple though not always so easy to apply as it is here. On the evidence in the record before us, the unanimous Court of Appeal decision correctly determined that the Division's finding these sharefarmers were employees was incorrect as a matter of law.

As the majority correctly observes: "The Workers' Compensation Act (Act) extends only to injuries suffered by an 'employee,' which arise out of and in the course of his 'employment.' (§§ 3600, 3700; see Cal. Const., art. XIV, § 4 (former art. XX, § 21).) 'Employee[s]' include most persons 'in the service of an employer under any . . . contract of hire' (§ 3351), but do not include independent contractors." (Maj. opn. *ante,* p. 349.) (§§ 3353, 3357.)

The meaning and content of the statutory control test has been clear since at least 1947 when this court explained: "An independent contractor is one 'who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished.' (Lab. Code, § 3353.) The distinction between the status of an independent contractor and that of an employee rests upon several important considerations. A material and often conclusive factor is the right of an employer to exercise complete and authoritative control of the mode and manner in which the work is performed. The existence of such right of control, and not the extent of its exercise, gives rise to the employer-employee relationship. (*S. A. Gerrard*

*Co.* v. *Industrial Acc. Com., supra,* 17 Cal.2d 411, 413-414 [110 P.2d 377]; *Riskin* v. *Industrial Acc. Com., supra,* 23 Cal.2d 248, 253 [144 P.2d 16]; *Industrial Indemnity Exchange* v. *Industrial Acc. Com.,* 26 Cal.2d 130, 135 [156 P.2d 926].) Strong evidentiary support of the employment relationship is 'the right of the employer to end the service whenever he sees fit to do so.' (*Press Publishing Co.* v. *Industrial Acc. Com.,* 190 Cal. 114, 120 [210 P. 820]; see, also, *Hillen* v. *Industrial Acc. Com.,* 199 Cal. 577, 582 [250 P. 570]; *Riskin* v. *Industrial Acc. Com., supra,* 23 Cal.2d 248, 253; *California Employment Com.* v. *Los Angeles etc. News Corp.,* 24 Cal.2d 421, 425 [150 P.2d 186]; *Yucaipa Farmers etc. Assn.* v. *Industrial Acc. Com., supra,* 55 Cal.App.2d 234, 237.) 'An employee may quit, but an independent contractor is legally obligated to complete his contract.' (*Baugh* v. *Rogers, supra,* 24 Cal.2d 200, 206-207 [148 P.2d 633, 152 A.L.R. 1043]; *Los Flores School Dist.* v. *Industrial Acc. Com.,* 13 Cal.App.2d 180, 183 [56 P.2d 581].) There are 'other factors to be taken into consideration,' as stated in *Empire Star Mines Co.* v. *California Employment Commission* [1946] 28 Cal.2d 33, at page 43 [168 P.2d 686]: '(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220 [Rest.2d Agency, §§ 2, 220]; Cal.Ann., § 220.)' " (*Perguica* v. *Ind. Acc. Com.* (1947) 29 Cal.2d 857, 859-860 [179 P.2d 812]; accord, *Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949-953 [88 Cal.Rptr. 175, 471 P.2d 975]; *Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43-44 [168 P.2d 686].)

"Generally speaking, it is a question of fact to be determined by the commission, from the evidence adduced, whether the essential employer-employee relationship exists (*Riskin* v. *Industrial Acc. Com.,* 23 Cal.2d 248, 255 [144 P.2d 16]), and the commission's finding on that issue will not be disturbed where it is supported by substantial evidence. (*S. A. Gerrard Co.* v. *Industrial Acc. Com.,* 17 Cal.2d 411, 414 [110 P.2d 377].) But 'if from all the facts only a single inference and one conclusion may be drawn, whether one be an employee or an independent contractor is a question of law.' (*Baugh* v. *Rogers,* 24 Cal.2d 200, 206 [148 P.2d 633, 152 A.L.R. 1043]; *Yucaipa Farmers etc. Assn.* v. *Industrial Acc. Com.,* 55 Cal.App.2d 234, 238

[130 P.2d 146]; see, also, *Burlingham* v. *Gray,* 22 Cal.2d 87, 100 [137 P.2d 9].)" (*Perguica* v. *Ind. Acc. Com., supra,* 29 Cal.2d at p. 859.)

The law as set down in the statute and explicated by this court has been uniformly followed both by this court and the Courts of Appeal throughout the years, and the Court of Appeal in this case correctly applied that law to the facts established by the record. In its opinion authored by Justice Capaccioli, it reasoned: "Here, the work to be performed was the care and harvest of the cucumber plants. Borello & Sons did not retain or exercise control over the manner in which those responsibilities were discharged by the share farmers once they were contractually undertaken except to require the share farmers to use their own families to perform the work. The share farmers were free to utilize their own methods and set their own hours. Although the Vlasic's pricing schedule was an economic incentive to pick the cucumbers while they were small, the share farmers were free to pick them at any stage of maturity. The share farmers determined when the cucumber crops would be irrigated.

"The following factors are also indicative of an independent contractor relationship. First, there was no evidence that Borello had the authority to terminate the share farmers at will. Second, the share farmers were required to furnish their own tools and equipment necessary to care for and harvest the cucumber plants. Third, the share farmers worked for a limited time period. Fourth, the share farmers were paid based on the result produced rather than upon the time devoted. Fifth, the parties evidently believed they were creating an independent contractor relationship. . . .

"We do not find the fact that Borello & Sons retained responsibility for the application of pesticides and fertilizer significant since those activities involve different skills and knowledge and were separable from the manual labor which the share farmers had contracted to perform. '[I]n weighing the control exercised we must carefully distinguish between authoritative control and . . . necessary co-operation where the work furnished is part of a larger undertaking. [Citation.]' (*Western Indemnity Co.* v. *Pillsbury* (1916) 172 Cal. 807, 813 [159 P. 721].)"

Departing from the statutorily provided and long established standard, the majority opinion makes a strenuous effort to justify its result. First, it discusses at some length the history of the development of the control test in an attempt to demonstrate that it is not as meaningful today as once it was. The answer is that it is statutorily prescribed (§§ 3353 and 3357) and that until today it was as meaningful as ever.

Next, the majority finds comfort in a number of federal decisions in other contexts and not involving our statutory standard and a number of out-of-state decisions of little consequence to us in view of the rather clear law of this state on the subject. Next reliance is placed on section 2750.5 relating to unlicensed contractors. The meaning of this statutory provision has itself been the subject of considerable dispute. (See *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5 [219 Cal.Rptr. 13, 706 P.2d 1146].)[8] But the simple answer here is that no claim has been made that the sharefarmers are required to be licensed, so section 2750.5 has nothing to do with this case.

I conclude that the majority opinion is incorrect on the facts and the law. If there is some problem with the sharefarmer arrangement that threatens the social policies of the state, which is not established by the record in this case, the Legislature is undoubtedly competent to remedy it. There is no need for this court to render a decision distorting the law and which, to boot, ignores the facts established by the record.

I would either dismiss the review as improvidently granted or affirm the judgment of the Court of Appeal.

Panelli, J., concurred.

---

[8] That decision had the unique effect of rewarding misdemeanor contracting without a license by extending to the unlicensed contractor workers' compensation benefits that would not have been available to him if he had obtained the proper license.