[No. A064113. First Dist., Div. Four. July 26, 1995.]

FIREMAN'S FUND INSURANCE COMPANY, Plaintiff and Respondent,
v.
LESTER DAVIS, Defendant and Appellant.

**COUNSEL**

Goldstein & Phillips, Andrew F. Pierce and R. Scott Erlewine for Defendant and Appellant.

Berger & Wolen, J. Russell Stedman, and Kimberly D. Griffin for Plaintiff and Respondent.

**OPINION**

**PERLEY, J.**—Defendant and appellant Lester Davis (Davis) appeals from a judgment after trial by the court, in a declaratory relief action, that he was not insured under the commercial general liability policy, No. 2 95 MZX 80232301 (policy) issued by plaintiff and respondent Fireman's Fund Insurance Company (Fireman's Fund). The basis for the judgment was a finding of fact by the trial court that, at all material times Davis was not an "employee" of any entity insured by the policy. Other issues involving whether Davis was insured by the policy were severed and reserved for later decision.

Davis contends: (1) the declaratory relief action was moot; (2) Fireman's Fund is precluded by judicial admission or estoppel from denying coverage;

(3) Davis was an employee; and (4) at all material times, Davis was acting within the scope of his employment. We affirm. Based on our conclusion that Davis was at all times an independent contractor, we find it unnecessary to address the fourth contention.

## I. RELEVANT FACTS

### A. *Background and the Policy*

From November 1987 through January 1988, Arthur Meyer conducted business through various corporations. Meyer was an officer, director, shareholder and the chief executive officer of each corporation. Rachel Porter was a director, shareholder and treasurer of each corporation. Dr. Patrick McLin was a principal investor, officer and director of the corporations. For ease of reference and in conjunction with the briefs filed by the parties we will refer to the various corporations as the Meyer companies. Meyer described their primary business as providing audio-video materials for in-house entertainment and instructional use at hospitals, corporations and other institutions.

During the period November 1987 through January 1988, the Meyer companies were insured by the commercial general policy issued by Fireman's Fund. Section II, paragraph 1.c. of the policy provides that "executive officers," "directors" and "stockholders" of a corporation are insured in their respective capacities. Section II, paragraph 2.a. provides that "employees" are insured "but only for acts within the scope of their employment." No further definition of employees is given by the policy.

The Meyer companies consistently lost money and ended their existence in a sea of litigation. On May 8, 1988, McLin filed a complaint against Meyer for waste and misappropriation of assets, fraud, breach of covenant of good faith and fair dealing, and negligent misrepresentation. Dr. McLin committed suicide in January 1989. On January 12, 1990, McLin's executor filed a first amended complaint against Meyer for damages caused by fraud, negligent misrepresentation, professional negligence, breach of contract, wrongful death and related causes of action.

On December 7, 1988, Meyer, Porter, and some Meyer companies filed a cross-complaint against Davis for conspiracy to commit fraud, fraud, conspiracy to induce breach of contract, inducing breach of contract, interference with contract, malicious abuse of process, trespass, intentional infliction of emotional distress, conversion, misrepresentation of interest, and interference with prospective economic advantage. The instant case involves the question of whether Fireman's Fund was obliged to pay Davis's defense

costs for this cross-complaint. It is undisputed and admitted by Davis that he was not an executive officer, director or stockholder. Thus, the ultimate factual issue was whether he was an employee or independent contractor at the material times.

### B. *Status of Davis*

Prior to October 1987, Meyer served as de facto sales manager and realized that he needed someone with a stronger background in sales. Further, Meyer determined that the companies should stop concentrating on developing a market in hospitals and switch their emphasis to corporations. Thus, in November 1987, an advertisement was placed in the San Francisco Chronicle for a sales manager for an audio-visual program.

Davis responded to the advertisement because he had a strong background in corporate sales and needed a job. In September, 1987, Davis quit a position where he earned $2,000 plus possible bonus and had some health insurance. He believed he was not earning enough. After interviewing with Meyer and others on November 16, 1987, Davis was offered the position of sales manager which he accepted. His first day on the job was November 17, 1987; he collected his last check on December 18, 1987.

Meyer testified: "I gave Mr. Davis, given his background in sales management, the most wide-open carte blanche. Find leads, generation as you can find them best to service our leads, generation and sales mechanisms. Therefore, he would have been free to choose virtually any vehicle that proved effective." Sales were turned over to Davis. Marketing strategy remained with Meyer. The two men would communicate over the telephone whenever either felt it was necessary. There was no requirement for Davis to report to Meyer on a regular basis. All Meyer needed to see was effective sales activity. Davis was expected to use his initiative, skills and experience to obtain sales in "unchartered territory."

Meyer further testified as follows. No set hours were imposed on Davis. Empty offices at corporate headquarters were made available, but it was expected that he would work at home or wherever it was necessary to obtain sales. Clerical services were not provided. Davis's name was not placed on the door of any office. Neither invoices nor timecards were submitted by Davis. A sign-in/sign-out board at the company office listed where he was working, so that he could be contacted if necessary. Business cards were provided to some personnel, but not to Davis. Company stationery was available for his use.

Compensation was by means of commissions; there were no benefits. Davis could draw against his commissions and was responsible for his own

expenses. Based on the size of the commissions, Meyer expected that Davis would engage in other occupations and imposed no limits on his doing so. Davis could have left his sales position at any time, but Meyer had not thought out whether Davis could be terminated at will. The position had an open-ended term. During the interview Davis was told he would not be an employee. However, an independent contract or agreement was not signed because Meyer wanted to dispense with formalities and proceed with the work. When Davis was given his last check on December 18, 1987, he signed an independent contractor agreement without serious protest.

Porter corroborated Meyer's testimony as to there being no set hours, company office, or clerical services for Davis, except that he might have been provided with a business card. She added that Davis was selected to fill a new sales development position based on his skills and background. No one working at the companies had the necessary skill. For purposes of prestige, he might have been given the title director of sales or vice-president of sales. Many persons working at the Meyer companies were called vice-president. Porter believed that Davis was performing work for other companies during his time with Meyer. In her capacity as treasurer she paid Davis as if he were an independent contractor. Davis stated that he preferred being an independent contractor.

Davis testified to the effect that he was treated as an employee with regard to control of his work, pay, hours, tenure and working conditions. Outside the courtroom he did, on occasion, refer to himself as a consultant and not an employee.

The statement of decision resolves credibility of witnesses as follows: "In spite of [Porter's] negative side, much of her testimony was believable." "The evidence clearly establishes that in developing start-up companies [Meyer] was quite charismatic and capable of obtaining substantial sums of money. His demeanor as a witness is anything but charismatic. Though his business practices are ethically questionable, certain portions of his testimony are believable." "Davis presented inadequate evidence to overcome Meyer/Porter's credible testimony . . . ." "Both Porter and Meyer testified credibly" that "the Meyer Companies did not retain the right to control how Davis performed his services or accomplish sales goals."

## II. Mootness

■ Davis contends that the declaratory relief action should have been dismissed as moot because by the time of the trial the underlying Meyer and Porter versus Davis cross-action had been settled, and Fireman's Fund was

not claiming reimbursement of money it had expended in such action on behalf of Davis. This contention lacks merit.

On March 7, 1990, Fireman's Fund filed a complaint in Marin county for declaratory relief and reimbursement of fees. Davis was named as a defendant. The complaint sought a "declaration and adjudication" that the policy "does not provide coverage for the liability or potential liability" of Davis in the various lawsuits arising out of the collapse of the Meyer companies.

On March 15, 1991, Davis filed a complaint against Fireman's Fund in San Francisco for breach of contract and breach of the covenant of good faith and fair dealing. The complaint alleged that a contract and covenant arose between Davis and Fireman's Fund because Davis was an employee of the Meyer companies and "[d]uring the period of such employment, [Davis] was at all times relevant an insured under the policy." It is undisputed that Davis could have filed a bad faith cross-complaint in the Marin county action but chose instead to file in San Francisco.

By April 1993, the underlying Meyer and Porter versus Davis cross-action had been settled, and Fireman's Fund was not claiming reimbursement of money it had expended in such action on behalf of Davis.

Code of Civil Procedure section 1060 provides that a declaratory relief action is appropriate to resolve issues arising under a contract "in cases of actual controversy relating to the legal rights and duties of the respective parties. . . ." Code of Civil Procedure section 1061 provides: "The court may refuse to exercise the power granted by this chapter in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." Davis argues that the "actual controversy" over coverage ceased to exist when Fireman's Fund dropped its claim for reimbursement from him. However, that argument ignores the bad faith action which involves the same coverage issue raised in the declaratory relief action.

The question posed to the Third District in *California Union Ins. Co.* v. *Trinity River Land Co.* (1980) 105 Cal.App.3d 104, 108-109 [163 Cal.Rptr. 802] was: which action survives when a declaratory relief action involving insurance coverage is filed in one county and a "bad faith" action involving the identical coverage issue arising from the identical policy is subsequently filed in a different county? The court held: "The controlling rule in this case, however, is that the pendency of another action growing out of the same transaction (here, the insurance contracts and the fire) is a ground for abatement of the second action but never for abatement of the

first. [Citations.] The underlying theory of the plea of another action pending is that the *first* action will normally be an ample remedy, and the *second* action (here, the Shasta County suit) is therefore unnecessary and vexatious." (Original italics.)

The identical question was posed to this court in *Lawyers Title Ins. Corp. v. Superior Court* (1984) 151 Cal.App.3d 455, 458-460 [199 Cal.Rptr. 1]. We held: "The fact that a suit for damages seems more appropriate or expeditious than a declaratory relief action and can resolve all issues is no basis for denying a motion to abate. . . . Under the rule of exclusive concurrent jurisdiction, when two superior courts have concurrent jurisdiction over the subject matter and the parties, the first court to assume jurisdiction has exclusive and continuing jurisdiction until such time as all necessarily related matters have been resolved. [Citation.]" (*Id.* at p. 460.) "Real parties also contend that abatement [of the bad faith action] is not appropriate because they would not be entitled to receive any type of monetary compensation in the San Francisco [declaratory relief] action. Real parties are correct in pointing out that abatement is not appropriate where the first action cannot afford the relief sought in the second. . . . [¶] Here, however, there is no obstacle to preclude real parties from filing a cross-complaint in the San Francisco action and from securing a determination of all issues." (*Id.* at p. 459.)

 We are persuaded by the reasoning and holdings of *Lawyers Title Ins. Corp.* and *California Union Ins. Co.* Accordingly, because the declaratory relief action was filed first and Davis could have raised his bad faith claims in a cross-complaint, it had priority and was not moot.

### III. JUDICIAL ADMISSION AND ESTOPPEL

 Davis contends that Fireman's Fund is precluded, on the grounds of judicial admission and estoppel, from asserting that Davis was not an employee of the Meyer companies. This contention lacks merit.

As Davis recognizes, a judicial admission can only arise from pleadings by a party in the case being litigated, which in the present case would be the declaratory relief complaint or answer. (1 Witkin, Cal. Evidence (3d ed. 1986) § 644.)

The Meyer and Porter versus Davis cross-complaint contains allegations which imply that Davis was an employee, although it does not specifically allege that such was his status. Meyer and Porter each separately verified the complaint. Both testified to signing the verification at the request of their

attorneys and in the belief, to use the words of Meyer, that the particular allegations were aspects of "lawyering." Neither considered Davis to be an employee.

The cross-complaint was properly admitted as evidence in the instant declaratory relief action. (*Dolinar* v. *Pedone* (1944) 63 Cal.App.2d 169, 176 [146 P.2d 237].) It was the province and duty of the trial court, as trier of fact, to consider the allegations and "to determine the weight to be given the admissions . . . ." (*Jones* v. *Tierney-Sinclair* (1945) 71 Cal.App.2d 366, 374 [162 P.2d 669].) The trial court's determination in the statement of decision is as follows. "This court gives little weight to statements in the verified cross-complaints regarding status of employment." Substantial evidence in support of the trial court is supplied by the testimony of Meyer and Porter explaining why they signed the verification.

■ Davis argues that Fireman's Fund was estopped from denying coverage to him because of its financing of the cross-complaint. Ordinarily, a carrier has no obligation in matters where coverage is excluded by the terms of the policy. However, postincident conduct may estop the carrier from relying on the policy if the carrier acts in an egregious manner, or the insured detrimentally relies on conduct or representations of the carrier. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574-576 [108 Cal.Rptr. 480, 510 P.2d 1032]—bad faith; *McMillin Scripps North Partnership* v. *Royal Ins. Co.* (1993) 19 Cal.App.4th 1215, 1222-1223 [23 Cal.Rptr.2d 243]—investigation; *Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263-264 [224 Cal.Rptr. 493]—withdrawal of defense based on previously unknown facts; *Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 755 [161 Cal.Rptr. 322]—reservation of rights.)

In the instant case, as found in the statement of decision, nothing in the entire record supplied to us on the appeal indicates or suggests in any manner that either of the above estoppel factors are present. Fireman's Fund had policy obligations toward Meyer and Porter which are completely separate from any obligation it might have toward Davis.

## IV. SUBSTANTIAL EVIDENCE AND STATUS OF DAVIS

■ Davis contends: "As a matter of law, Davis was an employee of the Meyer Companies." This contention lacks merit.

In *S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399], the Supreme Court set out the standards and factors governing the instant case.

■ "The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences and the [trier of fact's] decision must be upheld if substantially supported. [Citation.] If the evidence is undisputed, the question becomes one of law . . . ." (48 Cal.3d at p. 349.)

"Following common law tradition, California decisions . . . uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' [Citations.] [¶] However, the courts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship." (48 Cal.3d at p. 350.)

These secondary factors are listed as follows. "[W]e have noted that '[s]trong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations.]' [Citation.] Additional factors have been derived principally from the Restatement Second of Agency. These include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. [Citations.] 'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (48 Cal.3d at pp. 350-351.)

■ More specifically with regard to control, *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 386-387 [47 Cal.Rptr. 848] held: " 'An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only as to the results of the work, and not as to the means whereby it is to be accomplished." [Citations.] . . . 'However, the owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent

contract—including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship.' [Citation.]"

The overall burden before a court is set out in *Bates* v. *Industrial Acc. Comm.* (1958) 156 Cal.App.2d 713 [320 P.2d 167]: "While the above defined tests and rules are recognized as helpful, yet no special test, or fact, or circumstance has been found to give a conclusive answer to the question, and in the last analysis each case must turn upon its own peculiar facts and circumstances [Citation.]." (*Id.* at p. 719.) "Ostensibly, certain features of the employment indicated a relationship of employer-employee, but these factors only served to create a conflict in opposing inferences to be drawn from the evidence, which conflict the commission chose to resolve adversely to the petitioner." (156 Cal.App.2d 720.)

In the present case, the testimony of Meyer and Porter established that Davis was given a free hand to control the sales department of the Meyer companies. He was engaged for the position of sales manager because of his talent and background in sales. The Meyer companies were about to make a major effort to market their service to corporations and neither Meyer, nor other existing personnel, had the necessary skills or background for this distinct function. Results was the only criterion imposed on Davis. His pay was dependent on his ability to make sales. Hours, place of work and all other aspects of the position were left to the discretion of Davis. Although the at-will tenure indicates an employee status, control and the other secondary factors point in the direction of independent contractor. Accordingly, the trial court properly resolved the conflicting inferences and the findings are supported by substantial evidence.

## V. Disposition

The judgment is affirmed. Costs are awarded to Fireman's Fund.

Anderson, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied August 24, 1995, and appellant's petition for review by the Supreme Court was denied November 2, 1995.