# UNREDACTED

Filed 6/29/22; unsealed 7/29/22.

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| MARK ESSICK, | |
|     Plaintiff and Appellant, | A162887 |
|        v. | (Sonoma County Super. Ct. |
| COUNTY OF SONOMA et al., | No. SCV-267581) |
|     Defendants and Respondents. | |

Following the submission to the County of Sonoma (the County) of a harassment complaint against Mark Essick, the elected sheriff of the County, an independent investigator, Ms. Amy Oppenheimer, conducted an inquiry and prepared a written report. A local newspaper requested that the County release the complaint, the report, and various related documents (collectively, the Oppenheimer Report) pursuant to the California Public Records Act (CPRA) (Gov. Code, § 6250 et seq.). Sheriff Essick objected to the County's release of the Oppenheimer Report. In this "reverse" CPRA action, the trial court denied his request for a preliminary injunction barring the Oppenheimer Report's release.

Sheriff Essick appeals, contending the trial court erred because (1) the Oppenheimer Report should be classified as confidential under an exemption to the CPRA (Gov. Code, § 6254, subd. (k)), either as a "peace officer[]" "personnel record[]" (Pen. Code, §§ 832.7, subd. (a), 832.8, subd. (a)) or because it constitutes a "report[] or findings" relating to a complaint by a

1

member of the public against a peace officer (Pen. Code, §§ 832.5, subd. (b), 832.7, subd. (a)); and (2) the County should be estopped to release the Oppenheimer Report because it promised him that, in conducting its investigation, it would abide by Government Code section 3300 et seq. (the Public Safety Officers Procedural Bill of Rights Act) (POBRA), and it therefore should be bound to keep the results of the investigation confidential.[1]  We disagree on both points and will affirm.

## I. BACKGROUND[2]

In August 2020, while a large and complex set of wildfires swept through portions of Sonoma County in close proximity to many homes, Sheriff Essick met with the County Board of Supervisors, fire officials, and members of the public in a streamed town hall meeting.  During the meeting, Sheriff Essick provided updates on an evacuation strategy and fielded questions from the public.  When asked a question concerning whether evacuated residents might be permitted to reenter mandatory evacuation zones to feed pets and animals left behind, Sheriff Essick refused to grant such permission, citing safety concerns.

Following the meeting, Sheriff Essick exchanged text messages with Lynda Hopkins, an elected member of the Sonoma County Board of Supervisors.  Supervisor Hopkins started the exchange, asserting her belief there should be an evacuation process for pets and livestock, since the fire risk in the areas involved was high but not yet extreme.  Sheriff Essick

---

[1] See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2] We have concurrently filed public (redacted) and sealed (unredacted) versions of this opinion.  We hereby order the unredacted version sealed until 30 days from the date this opinion is filed.  Both the redacted and unredacted versions shall be provided to the parties.  Omissions in the public (redacted) version are shown by greyed out portions of the language in the opinion.

replied dismissively, telling Supervisor Hopkins there was already a process in place for livestock, and that pets "should have been evacuated already." He also commented that Supervisor Hopkins's preference for local firefighters rather than sheriff's deputies and police officers was "painfully obvious" and that she should "quit with the crap and come together for our community." He also left a text telling Supervisor Hopkins to call him if she wanted to discuss further.

In a later phone conversation between Supervisor Hopkins and Sheriff Essick, the tension between them rose. According to Supervisor Hopkins and her husband Emmett Hopkins, who overheard the conversation on speaker phone, Sheriff Essick criticized Supervisor Hopkins, accused her of "using gender as a cover" to hide her "failures as a leader," stated he would do whatever he could to expose her as a fraud, and informed her she was not his boss. Sheriff Essick's recollection of the conversation differed. In his version of what happened, Supervisor Hopkins accused him of being a bigot and a misogynist and said he is a "small man with a fragile ego who is afraid of women." Sheriff Essick claims he told Supervisor Hopkins he had great respect for women in leadership positions. He denies making many statements attributed to him, including saying that Supervisor Hopkins was "manipulative," "deceptive," not to be trusted, and had "no friends in this office."

Immediately after the phone call, Supervisor Hopkins lodged a complaint against Sheriff Essick with the Sonoma County Administrator, Sheryl Bratton, alleging harassment.[3] Ms. Bratton forwarded the complaint

---

[3] Under section 2-8 of the Sonoma County Code, the duties of the County Administrator are described as follows: "Supervise, direct and coordinate the administration of all county offices, departments and

to the County Human Resources Director, Christina Cramer, who conducted an intake interview of Supervisor Hopkins.  In September 2020, County Administrator Bratton, County Human Resources Director Cramer, County Counsel Robert Pittman, and Susan Gorin, the chair of the Sonoma County Board of Supervisors, jointly retained the Law Offices of Amy Oppenheimer, a private law firm, to conduct an impartial investigation of Supervisor Hopkins's allegations.  After collecting and analyzing the facts, Ms. Oppenheimer found by a preponderance of the evidence that Sheriff Essick made statements to Supervisor Hopkins that would reasonably have been understood as a veiled threat.  But the findings also concluded that these statements centered around political differences, not gender.

On December 16, 2020, the Board of Supervisors, in a letter over Chair Gorin's signature, gave Sheriff Essick "Formal Notice of Outcome of Investigation," which stated his comments and conduct directed at Supervisor Hopkins were contrary to Sonoma County's Governance Standards.[4]  More specifically, the letter deemed Sheriff Essick's behavior to be in willful disregard of his role as the sheriff, demonstrated a lack of professionalism, and was not to be tolerated.  The letter stated the report and admonishment would be placed in the investigation record along with the final investigative report.

---

institutions, and the official conduct of all county officers . . . as to all matters over which the board of supervisors has responsibility and control."

[4] We grant Sheriff Essick's unopposed request that we take judicial notice of the County's "Formal Notice of Outcome of Investigation," which was not included in the trial court record.  (Evid. Code, §§ 452, subd. (c), 459.) We assume without deciding that the records of county entities fall within the purview of Evidence Code section 452, subdivision (c).

Before the Board of Supervisors sent its admonishment to Sheriff Essick, the Press Democrat, a local newspaper, submitted a request under the CPRA seeking disclosure of the final investigative report. The day the Board sent its admonishment, County Counsel Pittman informed Sheriff Essick the Board had received the Press Democrat's CPRA request and intended to release the documents we refer to here as the Oppenheimer Report (i.e., the original complaint, the formal notice containing the outcome of the investigation, the confidential executive summary of investigative report, and a redacted copy of the confidential investigative report authored by Ms. Oppenheimer). Diane Aqui, Sheriff Essick's counsel, responded to Mr. Pittman asserting the requested documents are personnel records and investigative reports of a peace officer that are protected from disclosure under Penal Code section 832.7. Mr. Pittman wrote back, expressing his disagreement with Ms. Aqui's interpretation of the Penal Code and informing her the Board intended to release the records to the Press Democrat on December 24, 2020.

On December 21, 2020, Sheriff Essick filed a complaint for declaratory and injunctive relief against the County of Sonoma requesting the trial court bar the release of the Oppenheimer Report to the Press Democrat. In the complaint, Sheriff Essick requested a temporary restraining order and a preliminary injunction to keep the Oppenheimer Report closed to the public for the duration of the trial proceedings. The trial court issued the requested temporary restraining order and set a hearing for March 2021. But on May 19, 2021, the trial court entered a minute order denying the preliminary injunction, ruling there was no evidence to show the investigative records should be classified as "personnel records" (Pen. Code, § 832.7, subd. (a)) that

5

are protected from public release. The court entered a written order on June 7, 2021, denying the preliminary injunction.

Sheriff Essick appealed. We granted a temporary stay of the trial court's order on June 24, 2021, prohibiting the County from releasing the Oppenheimer Report until further notice. On July 30, 2021, we granted Sheriff Essick's petition for a writ of supersedeas, ruling that, pending the resolution of this appeal, the County may not release the subject records until further notice. The parties subsequently filed their briefs on the merits of this appeal.[5]

## II. DISCUSSION

### A. *Statutory Landscape*

Enacted in 1968 and modeled on the federal Freedom of Information Act (5 U.S.C. § 552 et seq.), the CPRA "grants public access to public records

---

[5] After the parties filed their briefs on the merits of the appeal, the County filed a motion to strike, asking this court to either (a) strike certain portions of Sheriff Essick's reply brief that allegedly contain improper new arguments, (b) disregard the challenged portions of the reply brief, or (c) accept a surreply brief responding to the allegedly improper arguments. Sheriff Essick filed an opposition to the motion to strike. Sheriff Essick also filed a motion for leave to file a "sur surreply brief" in the event this court accepts the County's surreply.

As to the County's motion to strike, we will not address point by point the parties' detailed contentions in their motion papers as to whether particular arguments made in Sheriff Essick's reply brief are improper. Suffice it to say that, in addressing the merits of this appeal, we have considered only those arguments in Sheriff Essick's reply brief that we view as proper rebuttal (and to the extent we may have considered any arguments the County believes to be improper, the County has suffered no prejudice, as we are ruling in its favor on the merits of the appeal). We deny the remaining relief requested by the County in its motion—we will not strike portions of Sheriff Essick's reply brief, and we will not accept the County's proposed surreply. Finally, we deny as moot Sheriff Essick's motion for leave to file a "sur surreply" that responds to the proposed surreply.

held by state and local agencies.  [Citation.] . . . '[It] was enacted for the purpose of increasing freedom of information by giving members of the public access to records in the possession of state and local agencies.  [Citation.] Such "access to information concerning the conduct of the people's business," the Legislature declared, "is a fundamental and necessary right of every person in this state." ' [Citation.]"  (*Becerra v. Superior Court* (2020) 44 Cal.App.5th 897, 913 (*Becerra*).)

Consistent with its basic design favoring disclosure, the CPRA broadly defines " '[p]ublic records' " as including "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency . . . ."  (Gov. Code, § 6252, subd. (e).) This expansive framing of the statutory right of access—a right that is ultimately rooted in our state Constitution (Cal. Const., art. I, § 3, subd. (b)(2))—is fundamental to our approach to construing the statutory scheme as a whole.  (*Becerra*, *supra*, 44 Cal.App.5th at p. 913 ["CPRA must be 'broadly construed' because its statutory scheme 'furthers the people's right of access' "].)  To be sure, "the [A]ct does not confer an absolute right of access."  (*Ibid*.)  In passing the CPRA, the Legislature declared it was " 'mindful of the right of individuals to privacy.' "  (*Becerra*, at p. 913, quoting Gov. Code, § 6250.)

The CPRA balances the dual concerns for privacy and disclosure by providing for various exemptions that permit public agencies to refuse disclosure of certain public records.  (Gov. Code, §§ 6254–6255.)  "In 2004, California's voters passed an initiative measure that added to the state Constitution a provision directing the courts to broadly construe statutes that grant public access to government information and to narrowly construe statutes that limit such access.  (Cal. Const., art. I, § 3, subd. (b)(2).)"  (*Long*

*Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 68 (*City of Long Beach*).)  Applying these constitutionally grounded principles of construction in a case involving a peace officer's personnel file, our Supreme Court held in 2014 that article I, section 3, subdivision (b)(2) of the California Constitution "does not affect the construction of any statute 'to the extent . . . it protects [the] right to privacy, including any statutory procedures governing discovery or disclosure of information concerning the official performance or professional qualifications of a peace officer.'  (Cal. Const., art. I, § 3, subd. (b)(3).)"  (*City of Long Beach*, *supra*, at p. 68.)  But the balance struck by the Legislature still favors disclosure in cases involving peace officer records and all other kinds of records.  That is because the party opposing disclosure under any CPRA exemption always bears the burden of proving the exemption applies (*City of Long Beach*, at p. 70; *County of Los Angeles v. Superior Court* (2012) 211 Cal.App.4th 57, 63–64), which means that, on the facts, doubtful cases must always be resolved in favor of disclosure.

Among the exemptions recognized within the CPRA scheme is the umbrella protection of Government Code section 6254, subdivision (k).  That provision protects "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege."  (Gov. Code, § 6254, subd. (k).)  Succinctly put, Government Code section 6254, subdivision (k) " 'incorporates other [disclosure] prohibitions established by law.' "  (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1283 (*Copley Press*), quoting *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 656; *City of Long Beach*, *supra*, 59 Cal.4th at p. 67.)  Thus, to mark out the precise reach of exemptions available under Government Code section 6254, subdivision (k),

we must look beyond the CPRA itself, to privileges and confidentiality protections defined elsewhere in the law.

Here, Sheriff Essick relies primarily on sections 832.7 and 832.8 of the Penal Code. These two provisions are found within the statutory scheme known as the *Pitchess* statutes. (Pen. Code, §§ 832.5, 832.7, 832.8.) Read together, Penal Code sections 832.7 and 832.8 protect as "confidential" the "personnel records of peace officers" and "information obtained from these records." (Pen. Code, § 832.7, subd. (a).) "Personnel records" means anything in a file maintained under the officer's name "by his or her employing agency" (Pen. Code, § 832.8, subd. (a)) that relates to a variety of subjects in which an officer may have a privacy interest, including, as pertinent here, the officer's "advancement, appraisal, or discipline" (*id.*, subd. (a)(4)) or "[c]omplaints, or investigations of complaints" concerning the performance of his or her duty (*id.*, subd. (a)(5); see *City of Long Beach*, *supra*, 59 Cal.4th at p. 68). Though it is not his principal focus, Sheriff Essick relies as well on Penal Code section 832.5, which—by cross-reference (Pen. Code, § 832.7, subd. (a))—extends overlapping confidentiality protection to records relating to investigations of certain citizen complaints against peace officers "in the possession of the [officer's employing] department or agency." (Pen. Code, § 832.5, subd. (b); see *id.*, subd. (a)(1).)[6]

_____

[6] Following the enactment of certain amendments in 2019, the *Pitchess* statutes "deem[] as nonconfidential—and subject to public inspection pursuant to the CPRA—all records maintained by a state agency relating to reports, investigations, or findings from incidents involving an officer's discharge of a weapon; an officer's use of deadly force or force resulting in great bodily injury; and incidents involving a sustained finding of a sexual assault or dishonesty by an officer. ([Pen. Code,] § 832.7[, subd. ](b)(1) (A)–(C))." (*Becerra*, *supra*, 44 Cal.App.5th at p. 918.) As a broad descriptor for complaints that are *not* subject to disclosure under Penal Code

**B.** ***The County of Sonoma Is Not Sheriff Essick's "Employing Agency"***

According to Sheriff Essick, "The ultimate question in this appeal is whether the records sought to be disclosed are 'personnel records' within the meaning of Penal Code § 832.8." In a closely related line of argument, Sheriff Essick contends that even if the records at issue here are not " 'personnel records' " as defined by Penal Code section 832.8, they are confidential files relating to the investigation of a "complaint[] by [a] member[] of the public" against a peace officer under Penal Code section 832.5. Both strands of the argument fail for the same reason: To support the " 'personnel records' " version of the argument under Penal Code section 832.8 and the citizen complaint version of the argument under Penal Code section 832.5, Sheriff Essick must demonstrate that the County is his employer. We conclude he has not met that burden.

That the County has chosen to pay its elected officials is immaterial to its relationship to Sheriff Essick. (Sonoma County Code, § 21-5 ["The unclassified service shall consist of: [¶] (a) All officers elected by the people"]; see generally Sonoma County Code, ch. 21 ["unclassified service" includes those over whom Civil Service Commission lacks authority].) The county sheriff is a public official elected by Sonoma County voters, and as such, is ultimately responsible to them—not to the Board of Supervisors or anyone

---

section 832.7, subdivision (b)(1)(A)–(C), Sheriff Essick uses the term "non-serious" complaints. We agree that Supervisor Hopkins's complaint and the finding relating to it were not per se disclosable under Penal Code section 832.7, subdivision (b)(1)(A)–(C), but to the extent that, implicitly, Sheriff Essick suggests her complaint was "non-serious"—in a colloquial sense, since that phrase appears nowhere in the statute—we do not endorse the language he uses to describe the operation of the 2019 amendments to the *Pitchess* statutes.

else in county government.  (Cal. Const., art. XI, § 1, subd. (b) [requiring elected sheriff].)[7]  Not only does the Board of Supervisors lack power to hire the county sheriff, it lacks power to fire the person in that office as well.  The Board of Supervisors, acting on behalf of the County, has no power to appoint or terminate the sheriff.  (Gov. Code, § 24205 [requiring elected sheriff even in charter counties].)

Nor does the Board of Supervisors have disciplinary power over the county sheriff.  In commissioning the Oppenheimer Report, the Board of Supervisors was fulfilling its "statutory duty to supervise the conduct of all county officers."  (*Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1210, citing Gov. Code, § 25303 [creating that duty].)  Contrary to Sheriff Essick's argument, Government Code section 25303 does not create an employer-employee relationship between the Board of Supervisors and the county sheriff.  Rather, a county board has "oversight responsibility" as to an elected sheriff but lacks power to direct how he or she performs official duties.  (*Dibb*, *supra*, 8 Cal.4th at pp. 1209–1210; cf. *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 [in applying the multiple criteria that determine the existence of an employment relationship for purposes of worker's compensation, " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . .' "].)

The Board of Supervisors did, to be sure, issue an admonishment of Sheriff Essick, but not every statement of disapproval is a "written

[7] It matters not that the County Administrator and County Counsel Pittman were also involved in the retention of Ms. Oppenheimer to carry out the investigation; in doing so, they were acting as adjuncts to the Board of Supervisors.

11

reprimand" constituting "punitive action" within the meaning of POBRA. The Board of Supervisors' admonishment could only be a "reprimand" if the Board of Supervisors were Sheriff Essick's employer. "Reprimands" must have employer-driven consequences—affecting promotion, advancement, or pay, and potentially leading to discharge. Written reprimands of peace officers are "punitive actions" only because they " 'may lead to the adverse consequences . . . at some *future time*' " *by the department issuing the reprimand.* (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 317 [italics added by *Otto v. Los Angeles Unified School Dist.* (2001) 89 Cal.App.4th 985, 996]; see *Gordon v. Horsley* (2001) 86 Cal.App.4th 336, 348 [written reprimand "punitive action" because it would "almost certainly have an impact on his future opportunities for advancement in the sheriff's department"]; *Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209, 1222 [citizens review board's non-disciplinary finding of misconduct "punitive action" because it would "be considered in future personnel decisions affecting [the] deputies and may lead to punitive action"]; *Hopson v. City of Los Angeles* (1983) 139 Cal.App.3d 347, 353 [police commission's report was "punitive action" because of "its potential impact on the [officers'] career opportunities"].) Sheriff Essick faces no such consequences here.[8]

We are not persuaded that the Oppenheimer Report is "discipline" from which the Sheriff might appeal. The Oppenheimer Report has no consequence for Sheriff Essick's duties, tenure, compensation, or benefits. If criticism of the conduct of elected officials were "discipline" subject to a full

---

[8] Sheriff Essick cites *Sparks v. Kern County Bd. of Supervisors* (2009) 173 Cal.App.4th 794, but that case does not hold that an elected sheriff is an employee of the Board of Supervisors within the meaning of the *Pitchess* statutes. Cases are not precedent for propositions they do not consider. (*McDowell & Craig v. City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38.)

array of due process rights for determining truth and accuracy, our democracy would function rather differently than it does. Any statements from members of the Board of Supervisors approving or disapproving Sheriff Essick's conduct, individually or collectively, are expressions of the Supervisors' own free speech rights and do not amount to discipline. (*Pickering v. Board of Education* (1968) 391 U.S. 563, 574 ["statements by public officials on matters of public concern must be accorded First Amendment protection"].) The truth and accuracy of such statements must be open to testing in the public square. Indeed, the fact we are dealing with what may fairly be characterized as political speech among elected officials toward one another underscores the importance of reading the CPRA in favor of disclosure.

Ignoring the overarching governance and free speech aspects of the situation here, Sheriff Essick urges us to treat him as a subordinate of the Supervisors, subject to their charge. He insists the County must be his "employer," otherwise the investigation here would have been merely an idle act. But he overlooks something basic about a system of divided government in which there are checks and balances. One of those cross-checks, at county level, is the oversight authority of the Board of Supervisors over other county officers. (Gov. Code, § 25303.) A central role of the Board of Supervisors, like any other legislative body, is to investigate the conduct of executive officials and thereby shine a light on matters that the voters of the County may wish to know. Here, the voters of the County have ultimate authority over the county sheriff, and they are entitled to be informed as to that person's strengths, as well as weaknesses, successes and failures—including the person's ability to model traits of civility and respect for others that may be expected in an official who should embody those values for the public.

13

*UNREDACTED*

**C.** ***By Commissioning the Preparation of the Oppenheimer Report, the County of Sonoma Did Not Take on the Role of Sheriff Essick's "Employer"***

Changing gears, Sheriff Essick asserts that, under *Copley Press v. Superior Court*, *supra*, 39 Cal.4th 1272, it is irrelevant whether the Board of Supervisors is the sheriff's employing agency in the normal course, because, on the facts presented here, "Sonoma County functioned as [Sheriff] Essick's employing agency by initiating the complaint intake, deciding to investigate, determining the process of investigation, making a final determination, issuing discipline, and maintaining the records" relating to the complaint. Thus, Sheriff Essick argues, by investigating actions carried out by him in his capacity as a "peace officer," the Board of Supervisors effectively took on the role of Sheriff Essick's employer.  We cannot agree.

Because the Oppenheimer Report was the product of an independent outside inquiry, the holding in *Copley Press* does not apply.  In that case, San Diego's Civil Service Commission performed statutorily mandated functions as to internal peace officer discipline the county sheriff's department would otherwise have handled.  (*Copley Press*, *supra*, 39 Cal.4th at p. 1292.)  There was no dispute that the records there were produced in what was tantamount to an internal personnel discipline process.  Our Supreme Court found that shifting this internal affairs function to an outside agency did not strip the records at issue there of the protection they would have had if generated internally.  (*Id*. at p. 1294.)  Here, by contrast, the Sonoma County Board of Supervisors was performing an independent investigative inquiry. Legislative oversight is something vastly different than the routine discipline of a rank-and-file peace officer and cannot be compared to outsourcing a routine internal discipline function.

The more analogous precedent is *Pasadena Police Officers Assn. v. Superior Court* (2015) 240 Cal.App.4th 268. In that case, the City of Pasadena retained an independent consultant to review its police department's policies following a fatal shooting of an unarmed teenager. (*Id.* at p. 274.) The Los Angeles Times and others sought disclosure of the resulting report under the CPRA. (*Pasadena Police Officers Assn.*, at p. 274.) The trial court denied a preliminary injunction in the ensuing "reverse" CPRA case, and the Court of Appeal affirmed. (*Pasadena Police Officers Assn.,* at pp. 274–275.) The court reasoned that the report did not reflect the advancement, appraisal or discipline of the officers involved in the shooting, and it refused to interpret the *Pitchess* statutes so broadly as to " 'sweep virtually all law enforcement records into the protected category of "personnel records." ' " (*Id.* at p. 288.) So, too, here, Sheriff Essick's argument, taken to its logical conclusion, would allow the *Pitchess* statutes to be used as a veil to conceal all records held by any agency or department of the County concerning acts done in his official capacity if anything in those records is critical of him or could in some way place him in an unflattering light. We reject the argument. The *Pitchess* statutes, properly read, provide no shield against embarrassment to an elected official who also happens to be a peace officer.

### D. *Sheriff Essick's Estoppel Claims Do Not Make the Records Confidential*

As a backup line of argument, Sheriff Essick contends that the Oppenheimer Report is confidential because the County of Sonoma promised him its investigation would comply with POBRA. According to Sheriff Essick, the County of Sonoma's agreement to conduct the investigation under POBRA created an enforceable legal promise that the records would be

confidential and he would have the right to a de novo administrative appeal, "whether he was entitled to them or not." We are not persuaded.

Because nothing in the POBRA statutory scheme explicitly grants or mentions confidentiality from CPRA requests, there was no misrepresentation or concealment of any material facts here. By voluntarily granting Sheriff Essick POBRA protections, Sonoma County was offering to go beyond what it was bound to do to ensure the investigation was procedurally fair. That gave Sheriff Essick, for example, a right to have counsel present during his interview and to have the interview conducted under certain neutral conditions, but it did not create any right of confidentiality. Sheriff Essick emphasizes that he was promised a right of de novo administrative appeal, along with the other procedural protections provided by POBRA; presumably, as we understand the argument, that means he had a right to have the initial report and findings held in confidence until he exhausted his administrative appellate rights. But since POBRA is silent on confidentiality, any claimed expectation of a right to appeal was independent of that issue. If the investigative report and findings were to be treated as confidential, the only arguable legal source for that protection came from outside of POBRA—specifically Penal Code sections 832.5, 832.7 and 832.8 of the *Pitchess* statutes, which, understandably, supply the primary basis for the argument Sheriff Essick advances in this appeal. Our conclusion that those statutes provide no confidentiality protection eliminates any possible legal foundation for his estoppel argument as well.

In the end, therefore, we reject Sheriff Essick's POBRA-based estoppel argument for the same reasons we reject his primary line of argument. Absent any confidentiality protection provided by the *Pitchess* statutes, there

is no substance to his estoppel claim. If Sheriff Essick believed Sonoma County's commitment to abide by POBRA procedures meant that any report produced at the conclusion of the investigation would be "absolutely" confidential, his claimed expectation of secrecy amounts to nothing more than a misunderstanding of the law. He could not possibly have relied justifiably on the County guaranteeing him a right to confidentiality that POBRA does not provide. And he cannot now bootstrap his way to confidentiality by invoking POBRA indirectly, via an estoppel argument that cannot be supported by proof of misrepresentation, concealment or reasonable reliance.

## III. DISPOSITION

The order of the trial court denying Sheriff Essick's request for a preliminary injunction is affirmed. This court's July 30, 2021 order prohibiting the County from releasing the records that are the subject of this appeal shall expire 30 days from the date this opinion is filed. The unredacted version of this opinion shall likewise remain sealed for 30 days from the filing of this opinion. Once that period expires, the unredacted version of this opinion shall become public and the County may release the records, unless the California Supreme Court orders otherwise. Costs shall be awarded to the respondents.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
DESAUTELS, J.*

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*UNREDACTED*

Trial Court:  Superior Court of California, County of Sonoma

Trial Judge:  Hon. Jennifer V. Dollard

Counsel:  Smith Dollar, Diane Aqui; Law Offices of Joseph G. Baxter and Joseph G. Baxter, for Plaintiff and Appellant.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Matthew C. Slentz, and Abigail A. Mendez, for Defendants and Respondents.